JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KOREA LINE CORPORATION,

Plaintiff,

- against -

SPAT INDUSTRIES LIMITED a/k/a ISPAT
NDUSTRIES LTD., ISPAT IND. LTD. or
SPAT IND.,

Defendant.

07 CV 11370

07 CV _____

ECF CASE



RECEIVED

DEC 19 2007

U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, KOREA LINE CORPORATION, (hereafter referred to as "KLC" or "laintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its erified Complaint against the Defendant, ISPAT INDUSTRIES LIMITED a/k/a ISPAT I DUSTRIES LTD., ISPAT IND. LTD. or ISPAT IND. ("ISPAT" or "Defendant"), alleges, u on information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all

material times the disponent owner of the motor tanker vessel "TALISMAN" (hereinafter the 'Vessel").

3.     Upon information and belief, Defendant ISPAT was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with place of business in India and was at all material times the Charterer of the Vessel.

4.     By a charter party dated February 5, 2007, Plaintiff chartered the Vessel to Defendant for one time charter trip for the carriage of calibrated/lumpy iron ore/iron ore pellets/quartize ore minerals duration about 12/15 days without guarantee.  A copy of the charter party is attached hereto as Exhibit 1.

5.     Plaintiff delivered the Vessel into the service of the Defendant and has at all times Iy performed its duties and obligations under the charter party.

6.     A dispute arose during the course of the charter party concerning the safe working capacity of the vessel's grabs used during cargo operations and the representations made within the contract of charter regarding the vessel's grab capacity.

7.     As a result of the inability of the vessel's grabs to safely discharge the cargo[1] loaded aboard the vessel by the Defendant the Defendant was required to employ and use shore grabs in order to unload the cargo from the vessel at the discharge port.

8.     Following cargo discharge the Defendant unlawfully withheld vessel hire due and payable to the Plaintiff on the alleged basis that the Vessel was off-hire while her grabs were unavailable to the Defendant and also to cover its costs for shore grabs.

9.     As a result of Defendant's breach of the charter party (clause 5 requiring payment of vessel charter hire without exception), Plaintiff has sustained damages as best as may be

---
[1]     The Defendant's cargo had a density of between 2.7 and 2.9 mt/cbm whereas the vessel's grabs had a safe working capacity for cargoes with a density of up to 1.1 to 2.4 mt/cbm.

presently approximated in the total principal amount of $89,458.58, exclusive of interest, arbitration costs and attorneys' fees.

10. Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London, with English law to apply. See clauses 17 and 30 of the charter party. Arbitration is ongoing in London.

11. This action is brought in order to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

12. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration conducted pursuant to English law. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---|
| A. | Principal claim – Unlawfully withheld hire: | $89,458 58; |
| B. | Interest on claim (3.5 years at 5.5% compounded quarterly) | $18,887 68; |
| C. | Estimated arbitration costs: | $35,000; and |
| D. | Estimated attorneys' fees and expenses: | $75,000.00. |
| Total: | | $218,346.26. |

13. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

14.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $218,346.26 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

G.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:      New York, NY
            December 19, 2007


                        The Plaintiff,
                        KOREA LINE CORPORATION


                        By: _____
                            Nancy R. Peterson
                            Kevin J. Lennon
                            LENNON, MURPHY & LENNON, LLC
                            420 Lexington Avenue, Suite 300
                            New York, NY 10170
                            (212) 490-6050 - phone
                            (212) 490-6070 - facsimile
                            nrp@lenmur.com
                            kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York )
                 )   ss.:   City of New York
County of New York )

1.     My name is Nancy R. Peterson

2.     I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.     The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.     The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     New York, NY
           December 19, 2007

_____
Nancy R. Peterson

6

EXHIBIT "1"

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 This Charter Party, made and concluded in ....*Mumbai*...... 6th .....day of... February .....+-+ ... 2007 .........
2 Between......*KOREA LINE CORPORATION – SEOUL, KOREA (As Disponent Owners)*.................................
3 Owners of the good..*Greek Flag*..*Steamship/Motorship*..."*TALISMAN*"..of...*Vessel's description – see attached*
4 of..*31,293*..tons gross register, and..*18,549*..tons net register, having engines of.......................Indicated horse power
5 and with hull, machinery and equipment in a thoroughly efficient state, and classed...*Lloyd*...............................
6 at............of about....*70,810.7*..cubic *meters* grain ~~feet-bale~~ capacity, and ...*56,019 metric*............tons ~~of 1240 lbs~~
7 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent~~
~~of ship's deadweight capacity,~~
8 ~~allowing a minimum of fifty tons)~~ on a draft of...*12.757 meters*.....~~feet....inches~~ on..salt...*Summer freeboard*,
inclusive of permanent bunkers,
9 which are of the capacity of about...................tons of fuel, and capable of steaming, fully laden *through out the*
*currency of this Charter Party,* under good weather
10 conditions about...*14.0*..knots *(average laden/ballast)* on a consumption of about..*31.0 metric* tons *intermediate*
*Fuel Oil (180 CST)* *(see Description attached)*.....~~tons of best Welch coal-best grade fuel-oil-best grade Diesel oil~~
11 ~~now.~~
12 ............................and..*ISPAT INDUSTRIES LIMITED* ...........Charterers of the city of..*Navi Mumbai*............
13    Witnesseth, That the said owners agree to let, and the said Charterers agree to hire the said vessel, from
the time of delivery, for
14 ~~about~~ For one time *Charter* trip via safe port(s), safe birth(s), safe anchorage(s), always within Institute
Warranty Limits and always in lawful trade of duration about 12/15 days without guarantee. Cargo intention
Calibrated/Lumpy iron ore / Iron ore pellets/Quartzite ore Minerals in bulk
5 .................................................................within below mentioned trading limits, *but always subject*
*to Owners' cargo/trading exclusion clause.*
6 Charterers to have liberty to sublet the vessel for all or any    part of the time covered by this Charter, but Charterers
remaining responsible for
7 the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of*
*Owners' obligations hereunder.*
8 Vessel to be placed at the disposal of the Charterers, *at on dropping last outward sea pilot one safe port*
*Kakinada-Haldia range (East Coast India) or in Owners option dropping last outward sea pilot one safe port*
*Chennai/Southern of Kakinada (East Coast India)* any time day or night, Sundays and Holidays included~~f~~
9
1 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as~~
~~otherwise provided in clause No.6), as~~
1 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.6~~
Vessel on her ~~arrival first load port of this Charter,~~ delivery to be ~~clean and~~
2 ready to receive ~~Charterers' intended~~ cargo with clean-swept holds (See Clause 70) ~~(in case vessel's holds are~~
~~not ready as specified by government or local independent surveyors, the vessel will be placed off hire from~~
~~the time of such failure until passing holds re-inspection and any directly related expenses incurred thereby~~
~~to be for Owners' account)~~ and tight, staunch, strong and in every way fitted for the service, having water ballast,
winches and
~~:~~ donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all
the winches at one and the same
~~:~~ time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be
employed, in carrying lawful merchan-
~~:~~ dise, ~~including petroleum or its products, in proper containers,~~ excluding....*See Clause 37* ...........................

26 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on dock at their risk,~~

27 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawf. (-trades- between safe port and/or ports in British North~~

28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, (ad/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29 ~~Mexico, and/or South America~~ .. *Trading exclusions see also Clause 67.* ........................................................................ ~~and/ir Europe~~

30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but exclu ling Magdal na River, River St.Lawrence between~~

31 ~~October 31st and May 15th, Hudson Bay and all nsefs ports; also excluding, when out of cot ton, White Sea, Black Sea and the Baltic,~~

32 ......................................................................

33 ......................................................................

34 ......................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36    1.That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew and watchmen *other than compulsory,* shall pay for the

37 insurance of the vessel, also for the entire cabin, deck, engine room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, cargo spaces, machinery and equipment for an i during the servica.

39    2.That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, canal tolls. *Customary* Pilotages, Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which *Owners are vessel is* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness *of the crew or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 ~~of six months or more.~~

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

6 Owners to allow them the use of any dunnage and shifting boards *and any other fittings already aboard vessel.* Charterers to have the privilege of using shifting boards

7 for dunnage, they making good any damage thereto.

8    3.~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

9 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~..........................................~~tons and not more than~~

0 ..........................~~tons and to be re-delivered with not less than~~..........~~tons and not more than~~..........tons. See Clause 35

1    4.That the charterers shall pay for the use and hire of the said Vessel at the rate of *USD 31,500/- (USD Thirty One Thousand Five Hundred only) daily including overtime if vessel delivered dropping last outward sea pilot one safe port Chennai-South of Kakinada range or USD 33,500/- (USD Thirty Three Thousand Five Hundred only) daily including overtime if vessel delivered dropping last outward sea pilot one safe port Kakinada-Haldia range — See Clause 68*

1 ..........................~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on~~..........~~summer freeboard, per Calendar Month,~~ commencing on and from the *time day* of her delivery, as aforesaid, and at

1 and after the same rate for any part of a *day month,* hire to continue until the *time hour of the day* of her re-delivery in like good order and condition, ordinary

1 wear and tear excepted, to the Owners (unless lost) *at on dropping outward pilot Mumbai any time day or night, Sundays and Holidays included*

56 ...............................unless otherwise mutually agreed. Charterers are to give Owners ~~approximate 30 days then not~~ less than...7/5/3/2/1............days

57 notice of vessels expected date of re-delivery, and probable port.

58    5.Payment of said hire to be made in New York in cash in United States Currency, se ~~mi-monthly~~ 12 days in advance, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee or deposit, or on any *fundamental* breach of this Charter Party, the Owners shall be at' liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they  (the Owners) may otherwise have on the Charterers. *First hire payment to be paid within 5 (Five) banking days after vessels physical delivery (see clause 43).* ~~Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agent, before 4 p.m., but if required by  Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the captain, *and approved by Owners,* by the Charterers or their Agents, subject

66 to 2½ % commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68    6.That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or safe place *of safe anchorage in port or elsewhere* that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *where it is customary for similar size vessels to safely*

70 lie aground *in Brazil, Argentina ports and Buenaventura. See Clause 67*

71    7.That the whole reach of the Vessel's Hold, Decks, and usual places of loading  (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew

73 tackle, apparel, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~

74 ~~paying Owners...............per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passenger allowed.*

76    8.That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, *lash, unlash, secure and trim and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or when required by Charterers authorize the Charterers or their Agents to sign on his behalf* Bills of Lading for

79 cargo as presented, *strictly in conformity with Mate's* ~~or Tally Clerks receipts.~~

80    9.That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10.That the Charterers shall have permission to appoint a Supercargo *at Charterers' risk and expenses,* who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch, *said supercargo to sign Owners' L.O.I, for riding on board.* He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the.

84 rate of $1.00 USD 10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying USD 1,100/- per month pro-rata at the current rate per man, for all such cable, victualling and entertainment.

86       11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily deck and engine Logs, showing the course of the vessel and distance run and he con-

89 sumption of fuel as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.

90       12. That the Captain shall use diligence in caring for the cargo and for the ventilation of the cargo.

91       13. That the Charterers shall have the option of continuing this charter for a further period of

92 ...............................................................................................................................................................

93 on giving written notice thereof to the Owner or their Agents..................days previous to the expiration of the first-named term, or any declared option.

94       14. That if required by Charterers, time not to commence before...14th February 2007......and should vessel

95 not have given written notice of readiness on or before...22nd February 2007...but not later than 4 p.m. Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. Owners to give 10/7/5/3/2/1 days notice of delivery and to keep Charterers updated of vessel's readiness.

97       15. That in the event of the loss of time from deficiency and/or default and/or strike of men or deficiency of stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship of cargo, drydocking for the purpose of examination or painting bottom. Or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost and all extra directly related expenses may be deducted from hire; and if upon the voyage the speed be reduced by

00 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

01 thereof, and all extra directly related expenses shall be deducted from the hire.

02       16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

03 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas.

04 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

05 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

06 purpose of saving life and property.

07       17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London New York,

09 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

10 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. See further Arbitration Clause 30.

11       18. That the Owners shall have a lien upon all cargoes, all sub-hire freight and all sub-freights for any amounts due under this Charter, including General Aver-

12 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

13 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien, or encumbrance incurred by them or their agents, which

14 might have priority over the title and interest of the owners in the vessel.

114    19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115    Crew's proportion. General Average shall be adjusted, stated and settled *in London, according to Rule) 1 to 15, inclusive, 17 to 22, inclusive, and Rule E of*

116    York-Antwerp Rules *1994 and subsequent amendments* 1924, at such port or place in he U ited States as may be selected by the carrier, and as to matters not provided for by these

117    Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into

118    United States money at the rate prevailing on the dates made and allowances for damage to ca go claimed, in foreign currency shall be converted at

119    the rate prevailing on the last day of discharge at the port or place of final discharge of such da naged cargo from the ship. Average agreement or

120    bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier

121    or his agents may deem sufficient as additional security for the contribution of the goods and for any cargo and special charges thereon, shall, if

122    required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the

123    carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

24    place of adjustment in the name of the adjuster pending settlement of the General Average a nd refunds (if credit balances, if any, shall be paid in

25    United States money.

26    In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,

27    whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute contract, or otherwise, the

28    goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in g neral average to the payment of any sacrifices,

29    losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the

30    goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and n the same manner as if such salving ship or

31    ships belonged to strangers. *Charter hire not contributable to General Average. Gen ral Average and Arbitration to be settled in London in accordance with English Law.*

2    Provisions as to General Average in accordance with the above are to be included in all bil s of lading issued hereunder.

3    20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grate s and stoves to be agreed to as to quantity, and the

4    cost of replacing same, to be allowed by Owners.

5    21. That as the vessel may be from time to time employed in tropical waters during the te m of this Charter, Vessel is to be docked at a

6    convenient place, bottom cleaned and painted whenever Charterers and Captain think necessa y, at least once in every six months, reckoning from

7    time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

........................................................................

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes, derricks)* capable of handling *its up to their maximum capacity in accordance with the description clause* three to *e, also* providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavie lifts, Owners are to provide necessary gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owner also to provide on the vessel power and electric light on deck and in cargo holds sufficient for night work in all holds simultaneously; lanterns and oil for

143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144 Charterers to have the use of any gear on board the vessel.

145    23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging.

146 steamer Charterers to provide one craneman winchman per crane hatch to work cranes winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,

147 deck-hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the

148 port, or labor unions, prevent crew from driving winches; shore Cranemen Winchmen to be paid by Charterers. In the event of a disabled crane or cranes which or winches, or

149 insufficient power to operate cranes winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time in proportion to the number of working hatches and extra directly related expenses including standby expenses, which Charterers undertake to keep to a minimum level occasioned

150 thereby.

51    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

52 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,

63 etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the attached protective clauses following clauses, both

54 of which are to be included in all bills of lading issued hereunder:

35    U.S.A. Clause Paramount

36 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April

37 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of

38 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading

8 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

0    Both to Blame Collision Clause

1 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the

2 Master, mariner, pilot or the servants of the Carrier in the navigation, or in the management of the ship, the owners of the goods carried

3 hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss

F or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-

i carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her

owners as part of their claim against the carrying ship or carrier.

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or lightships have been or are about to be with-

drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

port or to get out after having completed loading or discharging. Vessel never to force nor push ice nor to follow icebreaker, nor trade to areas where there is a danger of sea ice.

17 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171     navigation of the vessel, insurance, crew, acts of pilots and tugboats and all other matters, same as when
        trading for their own account.
172     27.A commission of 1.25 2.5 per cent is payable by the Vessel and Owners to Aryacorp Private Limited –
        Mumbai, India + 1.25 percent to Alpha Chartering Co.Ltd, Seoul - KOREA
173     ........................................................................................................................................................
174         on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175     28.An address commission of 2.5 per cent payable to................Charterers................on the hire earned and paid
        under this Charter

        Clauses 29 to 91 are to be fully incorporated within the terms of this Charter party.


        **OWNERS:**                                                              **CHARTERERS:**
        For and on behalf of Owners:
        KOREA LINE CORPORATION-SEOUL, KOREA
        As per authority received by e-mail on 14th February 2007.



        For ARYACORP PVT LTD

        (As Brokers Only)

        P. G.

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

29.  **Additional Fittings**

Deleted.

30.  **Arbitration**

This Charter Party shall be governed by English Law.
It is hereby agreed that all claims below USD 50,000 excluding interest and
costs shall be settled as per LMAA Small Claims Procedure current at the time
when the arbitration proceedings are commenced.

31.  **Arrest**

Should the vessel be arrested during the currency of this Charter at the suit of
any person having or purporting to have a claim against or any interest in the
vessel, hire under this Charter Party shall not be payable in respect of any
period whilst the vessel remains under arrest or remains unemployed as a
result of such arrest and the Owners shall reimburse to the Charterers any
expenditure which they may incur under this Charter in respect of any period
during which by virtue of the operation of the Clause no hire is payable.

This Clause shall not apply should the arrest be caused through any fault on
the part of the Charterers.

32.  **Asian Gypsy Moth**

Owners guarantee that the vessel meets all U.S./Canadian plant and quarantine
regulations and has not called any Russian Pacific port.

Furthermore, Owners guarantee the vessel is free of any stage of gypsy moth
life, be it in the form of egg masses, larvae or live animals. Cost, and
consequences due to vessel not being able to enter U.S./Canadian ports or not
being passed for loading by U.S./Canadian authorities on account of gypsy
moth infestation to be for Owners' account.

33.  **Bills of Lading**

Charterers' Bills of Lading to be used if required by Charterers without
prejudice to the terms and conditions of this Charter Party. No through Bills
to be issued under this Charter Party.

34.  **Bulldozers**

1

### RIDER CLAUSE TO MV. TALISMAN-ISPAT
### CHARTER PARTY DTD 5TH FEBRUARY 2007

Charterers to have the option to use the bulldozers in vessel's holds, provided not exceeding the tank top strength.

35. **Bunkers**

Vessel on delivery will have about 950 metric tons IFO and 40 metric tons MDO.

Vessel on delivery to have sufficient bunkers to perform Charterers intended voyage along with safety margin. Charterers to pay for estimated consumable bunkers along with first hire payment at prices at prices USD 305/- per metric tons for IFO and USD 515/- per metric tons for MDO. Vessel to be redelivered with bunkers as remaining on board without replenishment by Charterers.

36. **Cargo Claims/ P & I Club**

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P & I Clubs for the duration of this Charter Party. Entry shell include, but not to be limited to, ordinary cover for cargo claims.

Charterers are not responsible for any accident or damage to or on board the vessel which is normally covered with Owners' Hull and Machinery policy, unless the damages are caused by the Charterers or for which the Charterers are responsible.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall be asked to grant time extensions for suit in each and every occurrence which should not be unreasonably withheld. The so granted extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims as between Charterers and Owners shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996 and its subsequent amendments

37. **Cargo Exclusions**

All cargoes carried under this charter to be loaded, Stowed, carried and discharged in accordance with recommendations of IMO code of safe practice in accordance with IMO/local authority recommendations for such cargo.

2

### RIDER CLAUSE TO MV.TALISMAN-ISPAT
### CHARTER PARTY DTD 5TH FEBRUARY 2007

No cargo to be carried on deck. The vessel to trade with lawful merchandise, the following commodities however always to be excluded:
a) Livestock, Logs, Arms, Ammunition, Injurious, Inflammable Or Dangerous Goods, Asphalt, Calcium Carbide, Acids, Direct Reduced Iron Pellets, Motors Blocks Turnings, Nuclear Materials, Silica/Mineral Sand (See Below), Motor Spirits, Toxic Waste, Naphtha, Pitch In Bulk, Radioactive Products, Tar And Its Products, Caustic Soda, War Materials, Hides, Creosoted Goods, Charcoal In Gunny Bags, Pig Iron (See Below), Nickel Ore, Calcium Hypochloride, Explosives, Sunflower Seed Expellers, Salt (See Below) Scrap (See Below), Calcium Oxychloride, Metal Sulphides, Niger Seeds, Rails, Sulphur, Dischlorphenol, Bitumen, Nitrate Of Soda, Borax, Saltpetre, Sponge Iron, Indian And Pond Coal, Hot Briquetted Iron, Bonemeal, Char, Asbestos, Aggregates, Ferrosilicon, Cement (see below). Ammonium Nitrate In Fents Grade, Cement Clinker, Pig iron ok with soft load clause below Mineral sands ok except excluding Zircon, Spodumine, Silica and Rutile

### Pig Iron Clause
Charterers undertake that loading of the first layer of pig iron will not be released until touching tanktop and will not be dumped/dropped during loading. First layer of pig iron is to be loaded, stowed, trimmed to the satisfaction of the Master before loading balance of cargo.

Maximum total 5 dirty cargoes with allowed Ferro Silicon (Always loaded in accordance with IMO/Local regulations and recommendations)

Allowed dirty cargo consecutively but not to be last cargo prior redelivery

A) Charterer's liberty to load two cargoes of Calcined and / or green delayed Petcoke during the currency of this charter, provided not last cargo. Petcoke cargo always to be loaded in condition including temperature in accordance with IMO/Local authority recommendations for such cargo.

In case of loading Petroleum Coke:
Charterers to carry cargo of petroleum coke (whether it be full or part cargo), subject to the following conditions:

1) The petroleum coke mentioned herein is limited to the type of non hazardous / non dangerous Calcined type.

2) If Charterers exercise such option, Charterers undertake to use as few holds as possible provided vessel's stability trim and stress permitting.

3) Such cargo to be loaded / stowed / trimmed / discharged strictly according latest IMO and / or any other latest regulations / rules applicable to such cargo.

3

### RIDER CLAUSE TO MV.TALISMAN-ISPAT
### CHARTER PARTY DTD 5TH FEBRUARY 2007

Also petroleum cokes with temperatures including and over 52 degrees centigrade not allowed.

4) Should any additional / special wash down of holds before loading be reasonably recommended / proposed / required by master or shipper, Charterers undertake to arrange the same at their expense / time. After discharging of such cargo, Charterers to arrange at their expense time any additional / special wash down of holds including using chemicals as master reasonably considers it necessary. Charterers may request the vessel's crew to perform above services paying lumpsum us$ 800 per hold. Charterers remaining responsible for removal and disposal of washings.

5) Any extra expenses resulting therefrom / incurred thereby and any detention through any of the above causes to be for Charterers' account.

B) Seedcakes/Oilcakes may be carried provided loaded, stowed and discharged strictly in accordance with IMO and local government regulations.

C) Fishmeal – Charterer's liberty to load antioxidant treated fishmeal.

D) Logs – Charterers have the liberty to load light pulpwood and eucalyptus logs.

E) Ammonium Sulphate/Potassium Nitrate/Sodium Sulphate are permitted cargoes without restriction/lime washing, etc. provided always that they fall into the category of harmless fertilizer grades.

F) Vessel not to be traded in any consecutive short haul (i.e. 20 days round voyage or less)

G) Charterers have the right to carry injurious, inflammable or dangerous cargoes provided they are packed, labeled, loaded and stowed strictly in accordance with IMO or other local authority regulations at ports of call or places of transit and to master's satisfaction upto a maximum of 1,000 metric tons in total.

H) P & I NUCLEAR CLAUSE

Notwithstanding any other provision contained in this charter, it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this charter party. This exclusion does not apply to radio isotopes used on intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided

4

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

owners prior approval has been obtained to the loading thereof.

I) STEEL CARGOES

Vessel not to be called upon to stow by the 'California block stow' method.

Preloading survey to be held in the event of loading steel cargoes, cost of survey to be shared between owners and Charterers with copy report being made available to both parties. Owners p &i club to arrange surveys and furnish copy to Charterers.

J) HEAVY COILS

If required by Charterers, owners confirm that heavy steel coils may be loaded line for line in as many tiers as is necessary but always within vessel's permissible tanktop strengths and to masters satisfaction with regard to stress, trim and stability requirements. Coils to be loaded in accordance with and in compliance with local load/discharge port authorities regulations.

K) CONCENTRATES

Charterer's option to load concentrates, always in accordance with IMO, Canadian board of trade and local regulations and recommendations. Moisture test of cargo to be taken by competent authority just prior to loading and a certificate, stating moisture content is within IMO regulations, to be handed to master prior loading commences. All costs for Charterers account.

L) SALT

Charterers to have the option to load two cargoes of salt during this charter party. This cargo shall be loaded, stowed, carried, and discharged strictly in accordance with applicable national / international regulations and / or IMO code and recommendations at Charterers' risk and expense. If paint coating / lime washing of holds is required by shippers or owners, Charterers to arrange following at the Charterers' time and expenses: to coat holds with paint / lime, which is supplied by Charterers to master's satisfaction prior to loading salt and to arrange removal of the same to master's satisfaction. Charterers may request the vessel's crew to perform above services paying lumpsum us$ 800 per hold subject to Charterers being held responsible for any consequences arising out of such extra works imposed on them by Charterers. Salt not to be last cargo

5

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

## M) SOYABEANS/SBM

In the event that the vessel is called upon to load soyabeans or sbm Charterers
to provide to owners or master on completion of loading with a certificate of
quality of the cargo showing moisture content.

## N) SCRAP

Charterers option load max two cargoes of scrap during currency of this
Charter Party. Scrap to be shredded and/or HMS 1 and 2, or other scrap of
similar/better quality, but in any case not worse quality, always excluding
MBT and oil scrap.

First layer of scrap in each hold not to be released until touching tank top.
Thereafter sufficient loads of scrap to be lowered as close as possible to the
bottom of each hold, so as to provide a proper flooring and cushion to master's
satisfaction. Plates and structurals, if any, always to be lowered into vessel's
holds. Charterers and/or their servants to do due diligence when loading and
discharging in order to prevent pieces of scrap from falling on vessel/vessel's
deck. Charterers to arrange, at their time and expenses, holds survey before
loading and after discharging to ascertain damages to the holds.

Should electro magnets be used during loading and discharging then the risk /
time / expenses of recalibrating vessel's compass (if necessary) to be for
Charterers' account.

## O. CEMENT.

Charterers liberty load total 3 cargoes of bulk cement during currency of this
charter, of which 2 spout loading with open hatch allowed. Bulk cement to be
loaded through vessels permanent cement hatches and to be discharged with
siwertell or other mechanical means (not grabs). Charterers have the option to
load one bulk cement cargo by spout taking such precautions, to Masters
satisfaction, to limit, to a minimum, the amount of cement dust likely to effect
the vessels decks, cranes, hull and superstructure. In this event survey of
vessels condition to be undertaken at Charterers time and expense before
loading and after discharging of such cargo. Charterers to undertake to return
vessel to similar condition that existed prior loading as evidenced by survey at
their time and expense with shore labour if required, prior redelivery. Cement
and clinker not to be last cargo. Charterers may request the vessel's crew to
perform hold cleaning after cement paying lumpsum us$ 1,500 per hold
subject to Charterers being held responsible for any consequences arising out
of such extra works imposed on them (crew/owners) by Charterers. Charterers

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

shall provide the vessel with one set each of a water-tobey and submerged pump and necessary chemicals to facilitate such extra works by the vessel's crew.

Vessel has two cement holes on each hatch cover fore and after near the center line. Diameter of hole 350 mm or 700 mm.

<u>Owners allow to carry maximum 1 cement clinker</u>
(cement and clinker not to be last cargo) on same terms/conditions as per bulk cement clause option to load with spout .

38.  **Certificates/Vaccinations**

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings enabling the vessel and her crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain radio free pratique. In order to comply with this clause timely notification of vessels itinerary must be given to Owners.

If requested, Owners to provide Charterers with copies of any certificates/ approvals.

Any time lost and all extra directly related expenses resulting from Owners' non-compliance with the above to be for Owners' account and may be deducted from hire.

39.  **Crew Service**

With reference to Clause 3 of this Charter Party "customary assistance" shall include but not be limited to:

a)  All opening and closing of hatches, when and where required, if permitted by local regulations.

b)  Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.

7

RIDER CLAUSE TO M.V. TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

c)   Shaping up vessel's holds/hatches and cranes, if fitted, as much as possible prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the crew.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and crew generally required under this Charter Party.

40.   Deleted

41.   **Deductions**

Charterers' option to deduct estimated Owners' disbursements and bunkers on redelivery from last sufficient Charter hire, but always up to a maximum of USD 1000 per port of call.

Charterers to settle Owners' outstanding disbursement account within 3 months after redelivery and against port Agents' original vouchers.

42.   **Delivery of Cargo against Letter of Indemnity**

In case the original Bill(s) of Lading are not available at discharging port, Owners/Master to allow discharge of entire cargo against a single Letter of Indemnity executed by Charterers only and without any bank endorsement. Letter of Indemnity to be as per Owners P and I club standard wording. Should Charterers require vessel to change discharging port after Bills of Lading have been issued, Owners to comply with such instructions upon receipt of a faxed copy of a single Letter of Indemnity signed by Charterers only and issued in conformity with Owners' standard P & I Club form.

When and if required Charterers may place one original Bill of Lading on board, against which Bill of Lading delivery of cargo to take place on instructions received from Shippers/Charterers and all original Bills of Lading to be marked accordingly.

In the event that Charterers wish to issue new bills of lading, original bills of lading must be given to Owners for destruction before new bills are issued.

43.   **Delivery/Redelivery Time**

Delivery and redelivery time to be based on local time, but hire calculation to be based on Greenwich Mean Time.

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY BTD 5TH FEBRUARY 2007

44.    **Description Clause**

MV.TALISMAN
Vessel's call sign: SXSV
BUILT 2006 GREEK FLAG
56019 MT DWAT ON 12.575M (55.8TPC)
189.99M LOA
IMO # 9329813
G.T. : 31.293
N.T : 18.549
32.26 BM

| HOLD | GRAIN CUB.M | GRAIN CUB. FT. |
|------|-------------|----------------|
| NO.1 | 12.713.5 | 448977 |
| NO.2 | 14.709.8 | 519477 |
| NO.3 | 14.652.0 | 517435 |
| NO.4 | 14.709.8 | 519477 |
| NO.5 | 14.025.6 | 495314 |
| TOTALS : 70810.7 | | |

ABOUT 14 KN ON 31,0 MT IFO (180 CST) AVERAGE
PORT CONS: 2,5 MT IFO /DAY IDLE
5.0 - 6.0 MT IFO/DAY WORKING 24 hrs

5HOLDS/HATCHES
No1 17,91 X 19,23 M
No2 – 5 ALL 21,43 X 19,23M

HOLDS CO2 FITTED
FLAT FLOOR MEASUREMENT OF CARGO HOLDS AT TANK TOP IN
METRES
No1 FORE END 7,8 AFT END 23,6 L=28,4
No 2,3,4  29,0 X 23,6
No 5 L=30,2 FORE END =23,6 AFT END=9,2M

DECK STRENGTH 3,70 T/SQM HATCH STRENGTH 2,50 T/SQM
4X 30MT CRANES + GRABS 6,0 + 13,5 CBM
HOISTING SPEED  (HOOK WORK)  30MT X 18 M/MIN
                              17MT X 27 M/MIN
                              5MT X 55 M/MIN
                              EMPTY X 56 M/MIN
(GRAB WORK)  24MT X 18 M/MIN
LOWERING SPEED : 30MT X 58 M/MIN
LUFFING TIME : 60 SEC (26M-5M RADIUS)
SLEWING SPEED: 0.6 RPM

9

RIDER CLAUSE TO M.V. TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

BUNKER TANKS BREAKDOWN 100% FULL

| | |
|---|---|
| N0.4 BTM F.O. TK (P) | 367 CUB.MTR. |
| N0.4 BTM F.O. TK (S) | 367 CUB.MTR. |
| N0.5 BTM F.O. TK C | 488 CUB.MTR. |
| DEEP F.O. TK (P) | 657 CUB.MTR |
| DEEP F.O.TK (S) | 446 CUB.MTR |
| TOTAL | 2324 CUB.MTR. |
| M.D.O. TK (S) | 106 CUB.MTR. |

TOTAL BALLAST CAPACITY 31.093 M/T INCLUDING NO.3 HOLD
TOTAL BALLAST CAPACITY 16.073 M/T EXCLUDING NO.3 HOLD

F.WATER CAPACITY .428 M/T

TANK TOP STRENGTHS: FOR LOCAL LOAD: HOLDS No 1,2,4 & 5 =
25 MT/m2
HOLD No3 = 31 MT/m2

45. **Bimco Double Banking Clause**

a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside and such safe dock, wharf, anchorage or other place for trans-shipment, loading or discharging of cargo and/or bunkering.

b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

c) Without prejudice to the generality of the Charterers' rights under (a) and (b) it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do The Master has the right at any time to order the other vessel away from his vessel or instruct his own vessel to sail if he considers it unsafe for vessel to remain double banked.

d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any

10

### RIDER CLAUSE TO M.V. TALISMAN-ISPAT
### CHARTER PARTY DTD 5TH FEBRUARY 2007

additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including period for repairs as a result of such operation.

### 46. Houseflag/Markings

The Charterers shall have the liberty of flying their own house flag.

### 47. ITF/Boycott

Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a bona fide agreement, the standard of which is fully acceptable to the I.T.F. and Unions in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restriction, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire.

### 48. In Lieu of Hold Cleaning

Charterers have the right to redeliver vessel with unclean holds in exchange for payment of USD 4000/- lumpsum, dunnage always to be removed at Charterers time /risk and expense. Not withstanding the above, after intermediary hold cleaning and if vessel is redelivered in any of the special areas as defined in Marpol v regulation 5. Charterers always to remain responsible at their time and expense for the actual removal from the vessel of all /any residues including chemicals /water or other hold cleaning materials required to clean the vessels holds.

### 49. Inspection

The Charterers and/or their supercargo(es) shall have free and unlimited

11

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

access to the whole vessel including but not limited to bridge, holds, engine room, all vessel's tanks including bunker, lubricating oil, sludge, ballast water, fresh water tanks. Whenever required the Master must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their supercargo(es) and/or surveyor(s) to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales and/or other plans as requested and are allowed to make copies of same.

50.    **Insurance**

Premium for basic war risks insurance on hull and machinery and officers/ crew to be for Owners' account. Any additional premium nett of all rebates in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as excluded areas by war risks Underwriters to be for Charterers' account, however not to exceed what would have been quoted or charged if the vessel was covered on the London market. If Owners have not covered basic war risks insurance, Charterers only to pay the differential as if the Owners were covered and only against presentation of Underwriters' original invoice. Crew bonus for trading into these areas to be for Charterers' account.

War and warlike zones excluded from trading.

51.    **Intermediate Hold Cleaning**

If requested by Charterers and permitted by shore/stevedore regulations, as well as weather/sea conditions, crew will carry out intermediate hold cleaning for Charterers. Charterers to pay Owners USD 700 per hold used for normal cargo, USD 1000 per hold used for dirty cargo, however the master/crew/vessel are not held responsible for results/consequences of such intermediate hold cleaning.

52.    **Laying up/Return Insurance**

Charterers shall have the right to order the laying up of the vessel at any time and for any period of time at a safe berth or anchorage and in the event of such lay up the Owners shall promptly take steps to effect all the economies in operating costs, including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economies. At the request of the Charterers the Owners shall at any time provide an estimate of the economies which would be possible in the event of laying up of the vessel. The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days, provided the vessel is fully on

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

hire.

53.    **Loading of Steel**

Steel cargoes to be sufficiently dunnaged/lashed/secured and undashed/
unsecured at Charterers' expense and in their time by stevedores under the
supervision of the Master and up to his satisfaction.

Owners to appoint F & I surveyor to carry out a pre-loading survey and cost of
same to be shared equally by Owners and Charterers. Vessel will not be called
upon to stow by use of 'Block California stow method.'

54.    **Notices**

Owners to keep Charterers informed about vessel's position and delivery to
the Charterers.

55.    **Off-Hire**

Should the vessel put back whilst on voyage by reason of an accident or
breakdown or in the event of loss of time either in port or at sea or deviation
upon the course of the voyage caused by sickness of or accident to the crew or
any person on board the vessel (other than passengers or supercargo travelling
by request of the Charterers), or by reason of the refusal of the Master or crew
to perform their duties, or by reason of salvage or oil pollution, even if
alleged, or capture/seizure or detention by any authority/legal process except if
caused by Charterers, the hire shall be suspended from the time of inefficiency
until the vessel is again efficient in the same or equidistant position in
Charterers' option and voyage resumed therefrom. All extra directly related
expenses incurred including bunkers consumed during period of suspended
hire shall be for Owners' account.

The Charterers may, in their option, partly or wholly add any off hire period (s)
to the timecharter period. Such option to be declared when the vessel returns
on hire after off hire period if any.
During any off-hire period estimated to exceed 8 days, the Owners to give the
Charterers not less than 5 days definite notice of resumption of the service.

If the vessel has been off-hire for a period of more than 45 days, the Charterers
are at liberty to cancel the balance of this Charter Party, in which case
redelivery shall take place upon vessel being free of cargo, irrespective of
redelivery ranges.

13

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

56.    **Oil Pollution**

Owners guarantee to provide and maintain during the entire timecharter period at their expense and carry on board the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damage as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any consequential losses, damages or expense.

57.    **On/Off-Hire Survey**

A joint on/off bunker and condition survey to be carried out by a mutually agreed surveyor. Time and cost of same to be equally shared between Owners and Charterers.

58.    **Panama/Suez Canal**

Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal. Should the vessel not meet these or other canal requirements, Charterers may suspend hire for all time thereby lost and Owners to pay all expenses resulting from such failure as a consequence thereof.

59.    Deleted.

60.    **Power Clause**

The vessel to supply free of expense to Charterers' account 440 volt 3 phase 60 cycles and 40 kva per crane from engine room switchboard, provided that such crane cannot be used for cargo operation. Forklift trucks/bulldozers/ grabs/magnets etc., shall be allowed to be used in the holds if necessary, but always subject to vessel's permissible strength.

Charterers have the right to fit magnets or other loading/discharging equipment customary to the trade onto vessel's cranes subject to vessel's lifting capacity.

14

RIDER CLAUSE TO MV,TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

61.    **Protective Clauses**

The New Both-to-Blame Collision Clause, The New Jason Clause, Baltic Conference War Risks Clause for Time Charters 1993 (Code name Conwartime 1993), P & I Bunkering Clause and Hague Rules Legislation, as applicable and attached are all to be considered as part of this Charter Party and all Bills of Lading issued under this Charter shall be subject to all said clauses and contain Voywar 1993.

The USA/Canadian Clause Paramount as applicable or the Hague Rules as enacted in countries other than the USA or Canada as applicable to be incorporated in all Bills of Lading, except where Hamburg Rules are mandatory.

62.    **Punctual Payment**

Referring to lines 60 and 61, where there is any failure to make "punctual and regular payment" due to errors or omission of Charterers' employees, bunkers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 5 banking days notice to rectify the failure and where so rectified the payment shall stand as punctual and regular payment.

63.    **Sea Carrier Initiative Agreement**

Owners and Charterers confirm that they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

64.    **Smuggling**

Owners to be free from responsibility for any consequences owing to smuggling, unless caused by vessel's Officers and/or crew or Owners' servants.

65.    **Stevedore Damage**

Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to

a)    Give written notice to the Charterers as soon as practicable after occurrence of particulars available of the damage caused and name of the party allegedly responsible for the damage.

15

RIDER CLAUSE TO MV.TALISMAN-ESPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

b) Promptly, but latest within 24 hours, give written notice to the party allegedly responsible, giving particulars available of the damage and its alleged cause and where possible try to obtain the written acknowledgement of liability from such party, or failing that, try to obtain the acknowledgement of receipt of such notice.

c) As soon as practicable arrange, in conjunction with Charterers' agents, for the damage to be surveyed and an estimate of the repair costs given.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage which must be attended to as per the above procedure as soon as discovered, but latest upon completion of the voyage in question.

Charterers shall have the liberty to redeliver the vessel without repairing the damages for which Charterers are responsible as long as same does not affect the vessel's sea and cargo worthiness, but Charterers undertake to reimburse costs of repairs against production of repair bill by repairers and/or dockyard, unless otherwise mutually agreed. Stevedore damages affecting the vessel's sea and cargo worthiness for which Charterers are liable to be made good to the satisfaction of the class surveyor immediately at Charterers' time and expense.

66.  **Taxes**

Any dues or taxes on vessel, cargo and/or freight and/or hire to be for Charterers' account. However any taxes on Charter hire or the vessel, levied by country of vessel's flag and registry and/or Owners principal place of business to be for Owners account.

67.  **Trading Exclusions**

The vessel is to be employed in lawful trades for the carriage of lawful merchandise only between good and safe berths, ports or areas where the vessel can safely lie always afloat, except at such places in Brazil / Argentina ports and Buenaventura, where it is customary for the similar size and dimensions of vessels to safely lie aground, which is always at Charterers' risks and subject to the permissible/prevailing draft at entrance of the NAABSA port declared by port authorities/pilot. The Charterers are to furnish the Owners with all relevant information at the port(s) in question with conditions.

The vessel is to be employed within IWL especially excluding Russian/CIS

16

Pacific ports (as long as the present regulations in the trading countries, including but not limited to Canada and U.S.A apply restricting vessels trading there after calling Russian Pacific ports), Cambodia, Guinea Bissau, Turkish occupied Cyprus, Iran, Iraq, Somalia, Yemen; Ethiopia, Israel and Israelian controlled territories, Lebanon, Syria, Libya (including Gulf of Sidre/Sirte), Congo (Democratic Republic of formerly Zaire), Liberia, Mauritania, Nauru, Sri Lanka, Sierra Leone, Eritrea, Angola (including Cabinda, Haiti, Cuba, Burma (Myanamar), North Korea, Sudan, Syria, Albania, former Yugoslavia unless allowed by United Nations and approved by Owners' P & I Club (but Slovenia and Croatia allowed), all war, warlike and war risk zones declared from time to time by the London War Committee on war risk trading warranties The vessel is not allowed at any time to trade to the ports/areas which are prohibited from trading by the United Nations/USA and/or international organization of the U.N. and/or the authorities of the country under which flag the vessel is flying. No direct sailing between mainland China and Taiwan, between South and North Korea.

Vessel always to call / trading Nigeria / Egypt / Indonesia / Saudia arabia / Algeria / Oman / UAE / Qatar / Pakistan with charterers paying extra war risk premium.

If vessel calling Yemen, Lebanon, Congo, Libya it will be subject Owners'/ Owners' P & I prior approval which not to be unreasonably withheld.

Charterers only to have right to break Institute Warranty Limits only for Great Circle route.

War / Warlike zones excluded from trading.

Should the political situation in any of the excluded countries change to the extent that trading vessel to countries in question becomes acceptable and usual practice, Owners to consider any request from the Charterers to trade such countries, however always subject to Owners' approval.

68. <u>U.S. Trade - Unique Bill of Lading Identifier Clause</u>

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill of Lading identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4. 7A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

Non compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

69.  **Warranties**

Owners warrant that the vessel

-  is not blacklisted by Arab countries nor anywhere else within the agreed trading limits

-  has not traded Cambodia, Cuba, Israel and North Korea

-  is eligible for bunkers in the United States of America, its territories and possessions in accordance with directives from the United States Department of Commerce, Office of International Trade.

70.  **Hold Cleanliness**

On delivery vessels holds to be clean, swept, washed down with fresh water and dried, and ready in all respects to load Charterers intended cargo (es). Holds to free of salt, loose and/or rust scales and residue of previous cargo (es) to the satisfaction of an independent surveyor. Should the vessel fail hold inspection then the vessel to go off-hire from the time of such rejection till she passes inspection once again and all extra expenses incurred including bunkers consumed to be for Owners account.

71.  **Weather Routing**

The Charterers may supply an independent weather bureau advice to the Master during voyages specified by the Charterers and the Master shall comply with the reporting procedures of the weather bureau, however the Master remains responsible for the safe navigation and choice of route.

Evidence of weather conditions shall be taken from the vessel's deck logs and independent weather bureau's reports. In the event of a consistent discrepancy between deck logs and the independent weather bureau's reports, its discrepancy to be amicably settled equally basis half and half between owners and Charterers.

18

**RIDER CLAUSE TO MV.TALISMAN-ISPAT**
**CHARTER PARTY DTD 5TH FEBRUARY 2007**

72. **Drydocking Clause**

Vessel will not drydock during the whole timecharter period except in case of emergency.

73. **Hose Test Clause**

Charterers have the right to carry out any test including but not limited to ultrasonic test, hose test and chalk test on hatch covers during the entire period of the Charter.

74. **BIMCO War Cancellation Clause**

Either party may cancel this Charter Party on the outbreak of war or hostilities between any two or more of the following countries: the United States of America, Russia, the United Kingdom, France, People's Republic of China, Korea, Greece.

75. **Cranes and Grab Fitting/Operation Clause**

Owners confirm that vessels cranes and grabs are in good order and efficient working condition and are suitable in all respects for loading/discharging of Charterers intended cargo (es). Vessels gear and grabs are duly certified by a competent authority and the vessel has in its possession a valid certificate to this effect. Owners confirm that vessels grabs can be downrated to maximum 6 CBM if required by Charterers.

Owners confirm vessels cranes outreach is minimum 7.50 M from shipside.

In case of disablement of vessels gear (i.e. cranes/grabs) and unless caused by stevedores/cranemen Owners to pay the cost of labour and/or equipment affected by the breakdown, either stood-off or additionally engaged. This does not exempt Owners from liability for cost of hiring shore appliances and labour, but in such case vessel not to be off-hired except for time actually lost. Maximum Owners liability as per this clause not to exceed USD 2,500/- per crane and/or grab per day for expenses incurred due to disablement of cargo gear for which Owners responsible.

76. Deleted.

77. **BIMCO Standard ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

Owners confirm vessel is "ISM" approved and Owners are in possession of the necessary "SMC" and "DOC" certificates.

78.   Deleted

79.   **BIMCO ISPS Clause for Time Charter Parties:**

a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and then after during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or the Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall

20

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

ensure that the contact details of all sub-Charterers are likewise provided to
the Owners.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense
or delay, excluding consequential loss, caused by failure on the part of the
Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay,
costs or expenses whatsoever arising out of or related to security regulations or
measures required by the port facility or any relevant authority in accordance
with the ISPS Code including, but not limited to, security guards, launch
services, tug escorts, port security fees or taxes and inspections, shall be for
the Charterers' account, unless such costs or expenses result solely from the
Owners' negligence. All measures required by the Owners to comply with the
Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party account
according to this Clause, the other party shall indemnify the paying party.

U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

a)      If the Vessel loads or carries cargo destined for the US or passing
        through US ports in transit, the Charterers shall comply with the
        current US Customs regulations (19 CFR 4.7) or any subsequent
        amendments thereto end shall undertake the role of carrier for the
        purposes of such regulations and shall, in their own name, time and
        expense:

        i)      Have in place a SCAC (Standard Carrier Alpha Code);
        ii)     Have in place an ICB (International Carrier Bond);
        iii)    Provide the Owners with a timely confirmation of i) and ii)
                above; and
        iv)     Submit a cargo declaration by AMS (Automated Manifest
                System) to the US Customs and provide the Owners at the
                same time with a copy thereof;

b)      The Charterers assume liability for and shall indemnify, defend and
        hold harmless the Owners against any loss and/or damage whatsoever
        (including consequential loss and/or damage) and/or any expenses,
        fines, penalties and all other claims of whatsoever nature, including but
        not limited to legal costs, arising from the Charterers' failure to comply
        with any of the provisions of sub-clause (a). Should such failure result
        in any delay then, notwithstanding any provision in this Charter Party
        to the contrary, the Vessel shall remain on hire.

21

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

d)    The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

80.    Owners have the option to change vessel's flag.
Flag change to be subject to Charterers' acceptance of flag to be flown, which not to be unreasonably withheld.

81.    Owners have the option to sell the vessel.
New Owners to be subject to Charterers' prior approval, which not to be unreasonably withheld. New Owners to remain responsible for due fulfilment of this Timecharter.

82.    **Mortgage and Assignment**

Charterers agree that Owners may grant to its financiers an assignment of this Charter and all the Owners' rights, title, interest and benefits therein, including the right to receive Charter hire and other sums and may grant a mortgage and such other security documents as the financiers shall require. The Charterers agree to acknowledge and consent to be bond by notice of any assignment of this Charter executed by Owners.

83.    **Admixture Clause**

Whilst Charterers have the option to load two or more cargoes in the same hold, Charterers to supply, erect, dismantle and dispose of any and all separations at their risk and expense. Final distribution and position of any cargo within vessel and holds to be at Master's discretion and to his satisfaction. Any claims arising from contamination or admixture or sweat damage to cargo carried in the same hold to be for Charterers' account.
Should Charterers load containers, Owners not to be responsible for stowage of cargo in containers, nor cargo claims arising therefrom. Owners not to be responsible for stuffing or un-stuffing of containers.

84.    **Hamburg Rules**

Neither Charterers nor their agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a contract (whether or not signed on

22

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

behalf of the Owners or on the Charterers behalf or on behalf of any Sub-Charterers incorporating where not compulsorily applicable the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of the Hague or Hague Visby Rules.

85.    **Embargo**

The Charterers undertake not to load cargo for a port where there is an existing U.N. or USA embargo or where there is a boycott against the flag and/or nationality of this vessel which is in existence prior to Charterers declared intention to call such port.

86.    **BIMCO Fuel Sulphur Content Clause for Time Charter Parties**

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel at all times, to meet the maximum sulphur content requirements of any emission control zone when the Vessel is trading within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

87.    **Garbage Removal, Gangway Watchmen**

Dues for garbage removal and gangway watchmen, which are a compulsory requirement of the port, and thus a normal port expense, to be for Charterers account. If such items are not compulsory port expenses, then same to be for Owners' account.

88.    **Hire Payment Clause:**

Owners' bank account details:

HANA BANK
CHUNGANG CORPORATE CENTER BRANCH
SEOUL, KOREA.
A/C NO. : 100-265678-00232
VIA CITI BANK, NEW YORK

23

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

ABA NO. : 021000089
IN FAVOR OF KOREA LINE CORP

USD 31,500/- (USD Thirty One Thousand Five Hundred only) daily including overtime if vessel delivered dropping last outward sea pilot one safe port Chaennai – South of Kakinada range. or
USD 33,500/- (USD Thirty Three Thousand Five Hundred only) daily including overtime if vessel delivered dropping last outward sea pilot one safe port Kakinada-Haldia range.

First 12 days hire plus value of estimated consumable bunkers to be paid within 5 banking days after vessels physical delivery, but in any case before breaking bulk and after receipt of original signed Charter Party and original hire invoice on Owners own official letterhead duly signed and stamped, to Charterer's via Charterers brokers. Charterers brokers will issue original Charter Party and fax to Owners for their approval and authority to sign on their behalf and arrange for the necessary (including hire invoice as received from Owners) within Charterers office to ensure timely payment Owners hire invoice first to be fax to Charterers (via broking channel) and original sent in courier later.

89.    **Owners additional Clauses:**

aa) In no event shall Charterers procure, or permit to be procured, for the vessel, any supplies, necessaries or services on the credit of the vessel.

bb) Whilst, as mentioned elsewhere in this Charter Party, Charterers or their agents have the authority to sign Bills of Lading on Master's behalf, it is agreed that Bills of Lading will be claused with remarks as actually appearing on Mate's receipts.

In the event that vessel trades to the USA then bills of lading to be made out in a way acceptable to the US authorities failing which Charterers to be liable for any fines, delays or expenses arising therefrom.

cc) In the event that Charterers wish to order the vessel to proceed to discharge port(s) on a route other than the most direct, Charterers will provide Owners with written confirmation BY CHARTERERS' SIGNATURE ONLY.

dd) Where dunnage/pallets/crates/boxes/pallets etc are required, all such materials to have to be heat treated or fumigated in accordance with USDA rules and marked with the International Plant Protection Convention (IPPC) logo and appropriate country code. Supply/removal and disposal of dunnage

24

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

and other packing materials to be for Charterers account and time.

ee) In addition to the right of lien conferred on the Owners according to the provisions of the Charter Party Lien Clause, the Owners also to have a lien over bunkers on board, as well as over any sums due to Time Charterers under any sub-Charter Parties (in addition to freights and sub-freights), for any amounts due under this Charter Party. Further, in the event of the Owner's exercise of their liberty to withdraw (GRACE PERIOD CLAUSE APPICABLE) the vessel in accordance with provisions of the Charter Party withdrawal clause, the ownership of any bunkers remaining on board shall thereupon vest in owners, who shall allow to time Charterers by way of credit against any proven sums due to owners the value of such bunkers calculated in accordance with the provisions of the Charter Party bunkers clause applicable on redelivery

ff) Charterers agree that their agents will undertake without charge normal ship's husbandry as Owner's agents if required by Owners. However, this does not include any extraordinary business such as major crew changes, major repairs, dry docking, general average, etc., when Owners are obliged to appoint their own agent or to employ and adequately fund in advance Charterer's agents at the local recognised agreed agency tariff

gg) In respect of cargo loaded for the U.S. or in transit on the vessel through the U.S., including any U.S. territory, the Charterers shall be considered "Carriers" for the purpose of U.S. Customs Regulation entitled "Required Advance Electronic Presentation of Cargo Information" ("RAEPCI") and be responsible for the following items as required and defined by RAEPCI:

a) filing the vessel manifest electronically via the Vessel Automated Manifest System ("Vessel AMS");

b) obtaining a "Standard Carrier Alpha Code" ("SCAC"); and

c) obtaining an "international carrier bond" ("ICB").

hh) In the event that Charterers wish to trade the vessel for coastal trade within India Charterers hereby agree to accept full responsibility for any fines/dues/taxes due to Indian authorities, including Customs, arising from conversion/reconversion from foreign to coastal trade and vice versa, whether executed correctly or not, issuance of port clearances, and use of bonded stores. Additionally Charterers are to fully instruct agents to ensure that all formalities are carried out without error and absolve the Master/Owners from any responsibility that may attach regarding documentation required for such coastal trade.

25

### RIDER CLAUSE TO MV.TALISMAN-ISPAT
### CHARTER PARTY DTD 5TH FEBRUARY 2007

90.   It is understood that while discharging at anchorage, stevedors labour, crane
      drivers, supervisors would stay on board the vessel at Charterers risk. Owners
      to permit stevedore labour to cook food for their consumption in a sheltered
      location on deck as directed by the master and the use of cooking gear always
      to be fire protected and approved by master. It is further agreed that owners
      would provide reasonable quantity of drinking water to people as above,
      always provided such supply does not conflict with vessels requirements.
      Fresh water consumed by stevedores etc at discharge port(s) to be for Owners
      account.

91.   Charterers have the option to discharge into barges simultaneously with shore
      operations at berth or into barges only at safe anchorage with vessels
      gear/grabs. Barges will be equipped with suitable tyre fenders as per
      customary practice and per approval of master which not to be unreasonably
      withheld.

26

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

## BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules 1974 but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which or for the consequence of which the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

## P & I BUNKERING CLAUSE

The vessel shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CODE NAME: CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d)  (i) The Owners may effect war risks insurance in respect of the Hull

28

RIDER CLAUSE TO MV.TALISMAN-ISPAT
CHARTER PARTY DTD 5TH FEBRUARY 2007

and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

29

## RIDER CLAUSE TO MV.TALISMAN-ISPAT
## CHARTER PARTY DTD 5TH FEBRUARY 2007

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

----------xxxxxxxx----------

30